# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1055 | **DATE** | 8/31/2001 |
| **CASE TITLE** | J. Richard Oltmann vs. Steve Simon | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Oltmann's Motion for Summary Judgment is granted. Simon's Motion for Judgment on the Pleadings is granted with respect to Counts I and III of Oltmann's complaint. In light of the court's decision on Oltmann's Motion for Summary Judgment, Count II of Oltmann's complaint is dismissed as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 0 4 2001 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | SEP 0 4 2001 date mailed notice | |
| WAP | courtroom deputy's initials | E.D-7 FILED FOR DOCKETING 01 AUG 31 PM 4: 23 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

AUG 31 2001

Judge Harry D. Leinenweber
U. S. District Court

STEVE SIMON,

        Plaintiff,

      v.

J. RICHARD OLTMANN, J. RICHARD
OLTMANN ENTERPRISES, INC.
d/b/a HAUNTED TRAILS AMUSEMENT
PARKS, and RLT ACQUISITIONS,
INC. d/b/a LAZER-TRON,

        Defendants.

Case No. 98 C 1759
Case No. 99 C 1055
  (Consolidated)

Judge Harry D. Leinenweber

_____

J. RICHARD OLTMANN,

        Plaintiff,

      v.

STEVE SIMON,

        Defendant.

DOCKETED

SEP 04 2001

### MEMORANDUM OPINION AND ORDER

Steve Simon claims that J. Richard Oltmann and Lazer-Tron
stole his idea for a coupon redemption device to be used with
arcade games. Oltmann launched a pre-emptive strike with a lawsuit
alleging defamation and violation of the Illinois Consumer and
Deceptive Business Practices Act (the "Consumer Fraud Act"), and he
seeks declaratory judgment that he did not steal Simon's trade
secret. Simon countered with his own lawsuit against Oltmann and
Lazer-Tron, alleging misappropriation of a trade secret, violation
of the Lanham Act, breach of contract, conspiracy to commit fraud,



and fraud. Simon moves for judgment on the pleadings with respect to Oltmann's claims, and Oltmann and Lazer-Tron move for partial summary judgment on Simon's claims. For convenience, "plaintiff" will refer to Simon, and "defendants" will refer to Oltmann and Lazer-Tron.

## BACKGROUND

Arcade game players accumulate points while they play. Some machines work in conjunction with a ticket dispenser. When a player accumulates the required number of points, the dispenser gives the player a carnival ticket. Skilled players may be awarded multiple tickets. A player can then redeem the tickets for various rewards, including prizes and additional games.

Steve Simon, National Foosball Champion of 1975, claims that in 1994 he developed a coupon dispenser (the "device") for arcade games. Simon's device tallies the number of points earned by a player, but instead of dispensing tickets, it issues a coupon. The device can be programmed for a variety of messages, including advertisements and prize descriptions, or it may indicate the number of tickets a player has won.

Simon believes that his device represented an advance in the arcade game business for several reasons. Businesses that would not ordinarily carry arcade games for patron entertainment could now do so because the games could issue coupons stating any prizes won, and the coupon could then be redeemed at an establishment that

recognizes the coupon. The device could also be programmed with an auditing feature, allowing the owner to monitor the number of points earned or prizes issued. Such a feature could eliminate the need for tickets, thereby potentially reducing employee theft.

The idea behind Simon's invention was similar to others surfacing in the industry. Arcades already used games with attached ticket dispensers before Simon's invention. Video poker games utilizing attached coupon printers were marketed at trade shows. Lazer-Tron personnel and others in the arcade game industry took notice of these devices and considered adapting them for their own games.

Simon tried to market his invention in late 1994. He contacted Bromley Corporation ("Bromley") to see if it would be interested. Simon met with Bromley representative Joe Bundra, at which time Bundra orally agreed not to disclose information about Simon's device to third parties. Bundra ordered three prototypes of the device and tested it, but he told Simon during the summer of 1995 that the company was not interested. Simon also attempted to interest Creative Electronics and Software, Inc. ("CES") in the device. Although CES signed a non-disclosure agreement, ultimately it was not interested. Simon called Lazer-Tron's president, Norm Petermeier, to ask if his company might be receptive to any of his ideas, but Petermeier declined.

Simon met Oltmann at an October 1995 trade show.  Simon spoke with Oltmann for approximately fifteen minutes, telling him that he had a new invention that he wanted to bring to the market.  Later that month, Simon visited Oltmann at Oltmann's offices in Burbank, Illinois, where the two again discussed Simon's games and his desire to bring them and other products to the market.  Oltmann expressed interest in helping him.

Oltmann met with Simon again on October 22, 1995, at Simon's home in Austin, Texas (the "Austin meeting").  Oltmann signed a non-disclosure agreement, and Simon showed Oltmann the device.  Simon explained the features of his device, telling Oltmann that it could print out coupons instead of tickets; it could be condensed into a very small PC board and manufactured out of much smaller parts; it would be a simple product to manufacture; and production costs would fall between $99 and $200 per unit.  Simon demonstrated how the device worked and talked with Oltmann about the ways in which he believed it would broaden the market for arcade games.  Although Simon showed Oltmann a bill of materials and costs, he did not show Oltmann any of the device source codes or schematics.  Simon did not tell Oltmann how the device was built or discuss its various component parts.

Oltmann was very excited about the product.  However, Oltmann called Simon five days later and told him that, due to decreased revenue at his arcades and family health troubles, he was not

interested in pursuing any business deals. However, Oltmann spoke with Lazer-Tron the next day. Lazer-Tron's phone records show that on October 23, 1995, Lazer-Tron placed a call to Oltmann's home in Arizona, lasting more than 14 minutes. On October 25, 1995, Lazer-Tron again placed a phone call to Oltmann's home, lasting more than 15 minutes. Lazer-Tron called Oltmann's home again on November 2, 1995, with the call lasting just more than 2 minutes.

In fact, Oltmann had a long-standing relationship with Lazer-Tron. Oltmann owns and operates three arcades in Illinois. He designs and tests games and devices, and he also advises manufacturers, including Lazer-Tron, regarding their games. Oltmann and Petermeier are friends, and in February 1992, Lazer-Tron granted Oltmann 10,000 shares of its stock pursuant to a 1989 Stock Option Plan. Oltmann has designed at least eight games for Lazer-Tron, and he receives substantial royalty payments from Lazer-Tron for arcade games that he fully or partially designed. Oltmann testified during his deposition that, prior to the Austin meeting, he was not aware of any arcade game that had a coupon redemption feature.

In March 1996, Lazer-Tron brought a new game to the market called Solar Spin. In September 1996, Lazer-Tron offered a coupon printer that could be added to the game. Other games with a coupon redemption feature soon followed. As it normally takes Lazer-Tron approximately six months to develop a new product and bring it to

- 5 -

the market, the idea for the first game built with a coupon redemption feature was probably conceived in late 1995 or early 1996.

In October 1996, Simon saw an advertisement for Lazer-Tron's new "Super Solar Spin" game with a coupon redemption feature. Another advertisement in January 1997 showed a coupon from the Lazer-Tron game closely resembling coupons dispensed by Simon's device. Simon ordered and reviewed Lazer-Tron's promotional videotape for the game and coupon redemption feature. He claims that the video's description of the device and its industry applications were almost identical to his device and its applications as he had explained to Oltmann.

Simon contacted Oltmann and Petermeier and accused them of stealing his ideas, which they denied. Simon demanded proof that Lazer-Tron independently developed the feature, but unsurprisingly, Lazer-Tron refused. In a letter to Simon dated February 8, 1997, Oltmann claimed to know nothing about Lazer-Tron's coupon redemption feature despite the fact that he had ordered a game with the feature in September 1996.

On December 12 and 15, 1997, Simon's original attorney, Michael Saleman, wrote letters on Simon's behalf to Lazer-Tron and Oltmann, respectively, advising them that they had misappropriated Simon's proprietary and confidential information. The letters laid out the facts and circumstances surrounding Oltmann and Lazer-

Tron's alleged misappropriation and advised them that the letters constituted a pre-litigation offer to settle the case. Oltmann and Lazer-Tron each responded with letters stating that the allegations were untrue. On February 10, 1998, Saleman sent letters to both Oltmann and Lazer-Tron repeating the allegations and demanding settlement.

On March 23, 1998, Oltmann filed suit, accusing Simon of defamation, consumer fraud, and seeking declaratory judgment that he did not misappropriate Simon's trade secret. On July 10, 1998, Simon, through a different attorney, responded with his own suit in Texas federal court against Oltmann and Lazer-Tron, alleging misappropriation of his trade secret, unfair competition under the Lanham Act, breach of contract, and fraud.

## LEGAL STANDARDS

Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are subject to the same standard as a motion to dismiss under Rule 12(b). *N. Ind Gun & Outdoor Shows, Inc. v. South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). The facts must be viewed in the light most favorable to the non-moving party, and Rule 12(c) motions will be granted only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim. *Id.* To succeed, the moving party must demonstrate that there are no material issues of fact to be resolved, but the court is not obligated to ignore facts in the complaint that undermine

the plaintiff's claim. *R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). In determining whether a genuine issue of material fact exists, the Court construes all facts in the light most favorable to the non-moving party and draws all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Freeman v. Madison Metropolitan School Dist.*, 231 F.3d 374, 379 (7th Cir. 2000), quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Trade Secret Misappropriation

Simon accuses Oltmann and Lazer-Tron of misappropriating his trade secret. The parties never address with precision the scope of Simon's trade secret. It is ambiguous whether the trade secret consists of his idea for a device with the capabilities outlined

above or both his idea and the device itself. The parties frequently refer to the device alone when discussing the trade secret and its alleged misappropriation. Clearly, Simon's device is the embodiment of his idea. However, Simon refers to his trade secret in his brief as "a coupon redemption feature for skill-based arcade games," implying that the trade secret includes only the device capabilities. Supporting this conclusion is the undisputed evidence that Simon did not share with Oltmann any of the device source codes or schematics. Def. 56.1 Stmt. ¶ 47; Pl. Resp. to Def. 56.1 Stmt. ¶ 47. Simon showed Oltmann a bill of materials and costs, but he did not tell Oltmann how the device was built or discuss its component parts. *Id.*

Further, when discussing the trade secret, Simon describes the functions that the device can perform. He cites its ability to monitor the number of points earned or prizes issued and print a coupon with a variety of programmed messages, including point totals, prize descriptions, and advertisements. Therefore, the court concludes that Simon claims the idea as his trade secret, not the actual device itself.

The Illinois Trade Secret Act (the "ITSA") defines "trade secret" as

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

      (1)   is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

      (2)   is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

IL ST CH 765 § 1065/2.

Under the ITSA, "the information at issue must be sufficiently secret to impart economic value to both its owner and its competitors because of its relative secrecy." *Mangren Research and Dev. Corp. v. Nat'l. Chem. Co., Inc.*, 87 F.3d 937, 942 (7th Cir. 1996)(internal quotation and citation omitted). This requirement precludes trade secret protection for information generally known within an industry even if not to the public at large. *Id.* The real value of the information must lie in the fact that it is not generally known to others who could benefit from using it. *Id.* Thus, a product or service that is within the realm of general skills and knowledge in the industry cannot be a trade secret. *Pope v. Alberto-Culver Co.*, 296 Ill.App.3d 512, 515, 694 N.E.2d 615, 617 (1st Dist. 1998). It is the plaintiff's duty to show that the information sought to be protected is beyond the industry's general knowledge or skills. *See Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1072 (7th Cir. 1992).

Simon's coupon redemption feature cannot be classified as a secret one. Prior to Simon's invention, arcade games already

utilized ticket dispensers attached to the games. Def. 56.1 Stmt. ¶ 9; Pl. Resp. to Def. 56.1 Stmt. ¶ 9. While not quite the same as Simon's device, these dispensers receive signals from the games, send signals back, and issue carnival tickets to the player, with the arcade games keeping track of the number of tickets issued. Pl. Resp. To Def. 56.1 Stmt. ¶ 10. Prior to Simon's invention, Lazer-Tron personnel saw games with coupon printers. As early as 1989, Lazer-Tron representatives observed products at gaming industry trade shows with payout printers. Def. 56.1 Stmt. ¶ 15; Pl. Resp. to Def. 5 6.1 Stmt. ¶ 15. Petermeier testified at his deposition that the first time he saw a game advertised with a coupon printer was in 1993 with respect to a video poker game. Def. 56.1 Stmt. ¶ 17; Pl. Resp. to Def. 56.1 Stmt. ¶ 17. In August 1994, Lazer-Tron held a brainstorming meeting to discuss potential ideas for the company. The day before the meeting, Brian Kelly, one of the participants, prepared notes that refer to a ticket printer for printing tickets or coupons stating points won and bonus gifts. Def. 56.1 Stmt. ¶ 19; Pl. Resp. to Def. 56.1 Stmt. ¶ 19. Although meeting notes do not so reflect, participants recall discussing the addition of a coupon redemption feature to their games. Def. 56.1 Stmt. ¶ 20; Pl. Resp. to Def. 56.1 Stmt. ¶ 20.

Coupon printers generated interest elsewhere in the arcade game industry. Bromley's Joe Bundra stated in an affidavit filed

on Simon's behalf that he had begun developing a coupon printing device in 1990.  Def. 56.1 Stmt. ¶ 37; Pl. Resp. to Def. 56.1 Stmt. ¶ 37.  His idea for the device was also based on similar printers attached to video poker games.  *Id.*

Simon takes issue with Lazer-Tron's claims that it had knowledge of other machines using a coupon redemption feature before the Austin meeting.  He questions Lazer-Tron's claimed knowledge of the coupon redemption feature, arguing that the coupon printers observed by Lazer-Tron were attached to games of chance, such as video poker, not skill-based arcade games.  As a result, he argues, the coupon redemption feature was not well known within the relevant industry prior to the Austin meeting.

Even if a distinction is drawn between games of chance and skill-based arcade games when defining the relevant industry, Illinois courts have ruled that "[s]imply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret." *Serv. Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 455, 535 N.E.2d 1132, 1137 (1st Dist. 1989).  In *Pope v. Alberto-Culver Co.*, 296 Ill.App.3d at 513-14, 694 N.E.2d at 616, the plaintiff submitted a proposal to the defendant for a lye-based hair relaxer in a squeezable tube.  Although other hair relaxers were already available in a squeezable tube, lye-based hair relaxers were only available in jars or tubs.  *Id.*  The court ruled that the

information on which the plaintiff's proposal was based clearly existed before she sent the product idea to the defendant and therefore could not be afforded trade secret status. *Id.* at 517, 694 N.E.2d 618.

Trade secret protection seeks to strike a balance between social and economic interests. *Southwest Whey, Inc. v. Nutrition 101, Inc.*, 117 F.Supp.2d 770, 776 (N.D. Ill. 2000). Individuals who put forth the time, money, and effort to obtain a secret advantage should be protected from parties who obtain the secret through improper means. *Id.* On the other hand, competitive markets allow parties to utilize the general knowledge and skills acquired through experience in pursuing their occupation. *Id.* Simon invested considerable time and effort in developing his own device, and he has presented evidence that his meeting with Oltmann may have motivated Lazer-Tron's development of its own coupon printer.

Nevertheless, based on the undisputed facts, it is clear that the "coupon redemption feature" offered by Simon's device was known within the industry before the Austin meeting. Although a lesser technology, ticket dispensers were already used within the industry. Lazer-Tron personnel had seen video games, albeit games of chance, utilizing a coupon printing device. Lazer-Tron had even begun to consider creating a coupon redemption feature for their own games. The coupon redemption feature existed but had yet to be

applied to Lazer-Tron's field. The Austin meeting may have provided the impetus for the development of the Lazer-Tron device, but the idea had already been bandied about. Simon does not claim that his device was stolen; only that the "coupon redemption feature" was stolen. This feature, however, was already known to the industry by the time Simon met with Oltmann.

Simon's idea is not entitled to trade secret protection because it was based on information known to and readily available within the relevant industry. It is therefore unnecessary to reach the issues of misappropriation and Simon's efforts to keep his idea secret. Accordingly, defendants' motion for summary judgment is granted on Simon's trade secret misappropriation claim.

## Breach of Contract

Paragraph 5 of Simon and Oltmann's Nondisclosure Agreement provides that Oltmann has "no obligation with respect to any information . . . generally known within the industry." Based on the determination that Simon's idea was generally known within the industry, Simon's breach of contract claim must fail.

## Lanham Act

Simon contends that Oltmann and Lazer-Tron violated the Lanham Act, 15 U.S.C. § 1125(a), by engaging in unfair competition when they misappropriated his coupon redemption feature. However, ideas in the public domain may be used with impunity and do not require attribution. *See Murray v. National Broadcasting Co., Inc.*, 844

- 14 -

F.2d 988, 995 (2nd Cir. 1987). Therefore, the court grants summary judgment in defendants' favor with respect to Simon's Lanham Act claim.

## SIMON'S MOTION FOR JUDGMENT ON THE PLEADINGS

### Defamation

Oltmann claims that Simon defamed him when Saleman, his former attorney, sent Lazer-Tron the two letters accusing the company of misappropriating his device with Oltmann's help. Simon counters that even if the statements in the letters were defamatory, he is entitled to absolute immunity because they were preliminary statements to a proposed judicial proceeding. Simon cites to Restatement (Second) Torts § 586 and relevant Illinois case law in support of his contention.

Illinois has adopted § 586 of the Restatement, which protects attorneys from liability for any statements made prior to impending litigation. *See Golden v. Mullen*, 295 Ill.App.3d 865, 869, 693 N.E.2d 385, 389 (1st Dist. 1998). An Illinois court recently held, however, that § 586 only protects the *attorney* from liability, not the client. *Zdeb v. Baxter Int'l.*, 297 Ill.App.3d 622, 697 N.E.2d 425, 430 (1st Dist. 1998)(holding that the § 586 privilege did not shield defendant from liability for defamatory statements made by defendant's in-house attorney in pre-litigation letter).

This will not save Oltmann's claim. Although Simon has cited the wrong authority for his argument, his basic premise is correct.

Illinois has also adopted § 587 of the Restatement, which extends
the same privilege to parties facing impending litigation. *See*
*Thompson v. Frank*, 313 Ill.App.3d 661, 730 N.E.2d 143, 145 (3d
Dist. 2000). Section 587 provides:

> A party to a private litigation . . . is
> absolutely privileged to publish defamatory
> matter concerning another in communications
> preliminary to a proposed judicial proceeding,
> or in the institution of or during the course
> and as a part of, a judicial proceeding in
> which he participates, if the matter has some
> relation to the proceeding.

RESTATEMENT (SECOND) TORTS § 587 (1977). As an absolute privilege, it
protects the declarant from liability for defamation regardless of
his motive or the reasonableness of his conduct. *Thompson*, 313
Ill.App.3d 661, 730 N.E.2d at 145. Whether an absolute privilege
applies is a question of law. *Id.*

Because of the sweeping nature of an absolute privilege,
Illinois courts limit it to discrete situations, cautioning that it
should not be construed broadly so as to become a license
protecting every libelous statement made preliminarily to
contemplated litigation. *Gardner v. Senior Living Sys., Inc.*, 314
Ill.App.3d 114, 731 N.E.2d 350, 357 (1st Dist. 2000). For example,
statements made in a properly filed Equal Employment Opportunity
Commission charge are protected by the privilege, *Thomas v.
Petrulis*, 125 Ill.App.3d 415, 465 N.E.2d 1059, 1064 (2d Dist.
1984), but statements made prior to litigation lose the privilege
when published to persons beyond those who would necessarily

- 16 -

require the communication. *See Gardner*, 314 Ill.App.3d 114, 731
N.E.2d at 357; *Republic Tobacco, L.P. v. N. Atl. Trading Co.*,
No. 98 C 4011, 1999 WL 261712, at *10 (N.D. Ill. Apr. 9, 1999).

Oltmann argues that the absolute privilege should not apply in
this case because the letters were not written preliminarily to
litigation. According to Oltmann, Simon's attorney at the time
wrote the letters only to extort undeserved money from Lazer-Tron
and himself, and Simon never actually intended to file suit.
Oltmann points to the following facts as evidence of this argument:
Saleman wrote the letters, not Simon's current attorneys; Oltmann
filed his lawsuit against Simon before Simon filed his lawsuit; and
Simon did not file his lawsuit until seven months after Saleman
sent the demand letters. Oltmann expresses concern that extending
the privilege in this case will allow parties to libel and slander
others freely so long as they do so through an attorney, and he
also contends that Saleman's absence from the lawsuit precludes
application of the privilege.

After reviewing the complaint and the letters attached to it,
the court finds that the letters to which Oltmann so vehemently
objects are nothing more than ordinary demand letters. The letters
invite cooperation and resolution of the dispute prior to formal
litigation, a public interest deserving of protection. *See, e.g.,*
*Waterloov Gutter Protection Sys., Co. v. Absolute Gutter Prot.,*
*L.L.C.*, 64 F.Supp.2d 398, 416 (D.N.J. 1999)(holding such letters to

be absolutely privileged under § 586 of the Restatement and California law). In this case, the pleadings make clear that Simon only sent the letters to Lazer-Tron, which he later named as a defendant in his lawsuit. Oltmann does not claim that Simon published the allegedly libelous letters to third parties. Saleman's absence from Simon's lawsuit is irrelevant. Simon may have waited seven months before instituting his lawsuit, but the letters make clear that Simon would file suit if Lazer-Tron did not pursue a settlement. He did so, although not before Oltmann struck first. The delay fails to convince the court that Simon originally sent the letters with no intent of filing suit. Based on these facts, the absolute privilege applies and protects Simon from liability.

## Consumer Protection Claim

The Consumer Fraud Act prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact . . . in the conduct of any trade or commerce." 815 ILCS § 505/2. The law was designed "to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices." *Id.* § 505/1 (historical notes). Of course, non-consumers may bring actions under the Act. A business may assert a claim against

another if the alleged wrongful conduct involves trade practices aimed at the market generally or otherwise implicates consumer protection concerns. *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir. 1996); *Web Communications Group, Inc., v. Gateway 2000, Inc.*, 889 F.Supp 316, 323 (N.D. Ill. 1995).

Oltmann argues that, under a generous interpretation of "trade or commerce," Saleman's letters were misrepresentations written in the course of trade or commerce. The conduct at issue, however, must cause harm to consumers to be cognizable, *Amon v. Harrison*, No. 91 C 980, 1994 WL 532025, at *3 (N.D. Ill. Sept. 29, 1994) (statute does not "authorize a suit by a non-consumer where there is no injury to consumers"), and Oltmann does not meet this requirement. Even if consumers were deceived about the origins of the device in question, the court cannot conceive of a way in which consumers were harmed by such a deception.

Nor do Simon's alleged deceptions implicate "consumer protection concerns." Courts have struggled to define the scope of this term, *see Brody v. Finch Univ. of Health Sciences*, 298 Ill.App.3d 146, 159, 698 N.E.2d 257, 269 (2d Dist. 1998), but it generally involves sharp practices designed to mislead consumers about a competitor, *see Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill.App.3d 524, 533, 546 N.E.2d 33, 39 (2d Dist. 1989)(finding standing for plaintiff whose competitor distributed 15,000 disparaging brochures to consumers), or public

- 19 -

health, safety or welfare issues, *see Stickle Enters., Ltd. v. CPC Int'l., Inc.*, No. 96 C 3123, 1997 WL 767301, at *4 (N.D. Ill. Dec. 3, 1997)(allowing plaintiff to challenge competitor's deceptive actions to promote sale of contaminated animal feed). By these standards, Simon's actions do not implicate consumer protection concerns. Consequently, Simon's motion for judgment on the pleadings is granted with respect to Counts I and II.

## CONCLUSION

Oltmann's Motion for Summary Judgment is granted. Simon's Motion for Judgment on the Pleadings is granted with respect to Counts I and III of Oltmann's complaint. In light of the court's decision on Oltmann's Motion for Summary Judgment, Count II of Oltmann's complaint is dismissed as moot.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: *August 31, 2001*